# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| NORTHERN DYNASTY MINERALS LTD., PEBBLE LIMITED PARTNERSHIP, PEBBLE WEST CLAIMS CORP., and PEBBLE EAST CLAIMS CORP., <br><br> Plaintiffs, <br><br> v. <br><br> THE UNITED STATES, <br><br> Defendant. | Case No. __24-397 L__ |

## COMPLAINT

Northern Dynasty Minerals Ltd. ("Northern Dynasty"), Pebble Limited Partnership ("Pebble Partnership"), Pebble West Claims Corp., and Pebble East Claims Corp. (collectively "PLP") seek just compensation, pursuant to the Fifth Amendment to the U.S. Constitution, for the taking of their property in the Pebble Deposit in Alaska. In support of their request, plaintiffs state as follows:

## INTRODUCTION

1. PLP seeks relief under the Tucker Act, 5 U.S.C. § 1491, from the EPA's unprecedented Final Determination to veto discharges and discharge permits for mining activities across a nearly 200,000-acre area in southwestern Alaska that encompasses the entirety of the known Pebble Deposit.

2. The Pebble Deposit is a rich deposit of copper and other valuable minerals in southwestern Alaska. It is currently the largest known undeveloped copper deposit in the world, equivalent to at least 4% of world reserves. It also contains enormous amounts of other valuable minerals, such as ores of rhenium, molybdenum, silver, and gold.

3. PLP holds the mineral rights, through claims from the State of Alaska, to the entirety of the known Pebble Deposit. That area is located within the area of the EPA's vetoes.

1

4. Since first acquiring mineral rights in the Pebble Deposit in 2001, PLP has invested over one billion dollars, through the course of decades of work, to develop the Pebble Deposit. PLP developed, and revised, plans for a mine to extract copper, gold, molybdenum, and other minerals from the Pebble Deposit. PLP has worked under close regulatory oversight from the State of Alaska. PLP also worked diligently with the U.S. Army Corps of Engineers ("Army Corps") over several years to refine its mining plans to reduce environmental impacts and to develop mitigation measures for any remaining impacts. PLP spent almost $200 million on environmental research to mitigate the impact of the proposed mine and give the company, regulators, and the community a comprehensive understanding of the impacts of developing the Pebble Deposit.

5. The minerals in the Pebble Deposit are enormously valuable. Copper is particularly important to electricity and other renewable energy production, distribution, and consumption, including to the transportation industry's ongoing transition from internal combustion engines to electric motors and batteries. Molybdenum, rhenium, gold, silver, and the other metals extractable from the Pebble ores are worth, pound for pound, multiples more even than copper.

6. Despite PLP's significant investments in the Pebble Deposit and the importance of bringing these resources to market, the EPA took unprecedented action to block any development or use of the Pebble Deposit. Ultimately, the EPA issued a Final Determination under section 404(c) of the Clean Water Act. 88 Fed. Reg. 7,441 (Feb. 3, 2023). The Final Determination prohibits the issuance of Clean Water Act permits for discharges within a certain area based on one version of PLP's mining plan, for any project that would have any impact "comparable" to that plan; and prohibits discharges into the waters of the United States, within a nearly 200,000-acre area, for any project with an impact "comparable" to that plan. These bans, together or separately, make it impracticable to extract minerals from the Pebble Deposit.

7. With the stroke of a pen, the EPA destroyed what PLP worked so hard over decades to create, alongside the ultimate landowner, the State of Alaska. The EPA has blocked development of a vast mineral resource, and the associated economic opportunities for communities and Alaska Native Village Corporations near the Pebble Deposit and the State of Alaska as a whole.

8. As set forth below, the EPA's Final Determination is a permanent taking of PLP's property. The Final Determination was intended to and did have the effect of blocking mining of the Pebble Deposit.

9. Even if the EPA withdrew the Final Determination, the existence of the Final Determination has constituted a temporary taking from PLP up until the point of such withdrawal, because in the meantime it has blocked PLP from proceeding on its mining plans.

10. PLP seeks all available relief under the Tucker Act to remedy the EPA's taking. In particular, PLP asks the Court to grant monetary judgment equal to the just compensation owed to PLP for the permanent and temporary taking of its property.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action and venue is proper in this Court pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1), as PLP presents a "claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department" seeking damages.

12. This controversy is ripe because the EPA's Final Determination vetoing discharges and discharge permits was a final decision with no further administrative remedies available to contest the Final Determination.

## PARTIES

13. Plaintiff Northern Dynasty is a Canadian company that is publicly traded on the Toronto Stock Exchange and the NYSE American exchange, and is headquartered in Vancouver,

3

British Columbia. Northern Dynasty owns, through subsidiaries, 100% of Pebble Partnership. Northern Dynasty's operations are focused on designing, permitting, building and operating the Pebble Project.

14. Plaintiff Pebble Partnership is an Alaska limited partnership based in Anchorage, Alaska. It has overseen a robust program of activities related to the Pebble Project in the areas of mineral exploration, engineering design and mine planning, environmental/socioeconomic studies, stakeholder relations and public affairs. Pebble Partnership owns 100% of Pebble West Claims Corp. and Pebble East Claims Corp.

15. Plaintiffs Pebble West Claims Corp. ("Pebble West") and Pebble East Claims Corp. ("Pebble East") are Alaska corporations headquartered in Anchorage, Alaska. Pebble West holds title to 1,252 mining claims in the Pebble Deposit area and Pebble East holds title to 1,150 mining claims in the Pebble Deposit area. Together, these two hold the entirety of the mining claims on the areas known to hold recoverable minerals at the Pebble Deposit.

16. Defendant is the United States, which acted through its Environmental Protection Agency and the officers of that agency, as well as through the Army Corps of Engineers and the officers of that agency.

## STATUTORY AND REGULATORY BACKGROUND

17. Congress enacted the Clean Water Act, including section 404(c) in its current form, in 1972. Pub. L. 92-500, 86 Stat. 884.

18. The Clean Water Act requires a person to obtain a permit, under section 404, before discharging any "pollutant" into the navigable waters. 33 U.S.C. § 1311(a). "Pollutant" is defined to include, among other materials, "dredged spoil," "rock," and "solid waste." *Id.* § 1362(6).

19. The mining operation described for the Pebble Deposit removes the rock that contains valuable minerals as well as soil overlying the deposit and other rock ("waste rock") associated with

4

the mineral-containing rock. Then the mineral-containing rock is processed to extract the minerals, leaving behind tailings. The proposed project for the Pebble Deposit would utilize two tailings storage facilities, located behind rock-filled tailings dams. Mining at the Pebble Deposit will involve discharging of waste rock and tailings in areas that include streams.

20. The Army Corps can issue permits allowing "discharge of dredged or fill material into the navigable waters at specified disposal sites," which are to be "specified for each such permit by the Secretary . . . through the application of guidelines developed by the Administrator, in conjunction with the Secretary." *Id.* § 1344(a), (b).

21. Ordinarily, an application for a section 404 permit results in an analysis, by the Army Corps, of economic considerations pertinent to the proposed activity and the potential environmental impacts, pursuant to both the National Environmental Policy Act ("NEPA") and to the aforementioned guidelines (the "404(b) Guidelines").

22. But under section 404(c) of the Clean Water Act, the EPA might veto a permit. The EPA can, in general, "prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site," and "deny or restrict the use of any defined area for specification . . . as a disposal site," if the EPA "determines . . . that the discharge of such materials into such area will have an unacceptable adverse effect on" four specific types of resource: (1) "municipal water supplies"; (2) "shellfish beds and fishery areas (including spawning and breeding areas)"; (3) "wildlife"; or (4) "recreational areas." 33 U.S.C. § 1344(c).

23. In the history of section 404(c), the EPA had, before the Final Determination, issued only 13 vetoes. The Army Corps has issued myriad Clean Water Act permits for discharges arising from mining operations, including for tailings dams built across streams and wetlands.

## **FACTUAL BACKGROUND**

24. The Pebble Deposit sits within a remote area about 200 miles southwest of Anchorage, Alaska. The closest communities are the villages of Iliamna, Newhalen, and Nondalton, each approximately 17 miles from the Pebble deposit. The nearest village of Nondalton has roughly 130 inhabitants.

25. The State of Alaska has designated the area around the Pebble Deposit for potential mineral development. The land in this area is owned by the State of Alaska, and it has the legal status of land conferred on the State under the Alaska Statehood Act for use in mining. The United States gave the State certain lands under the Statehood Act, section 6(i) of which made explicit Congress's intent that those lands be available for mining under regulation by the State. In 1976, the United States traded the State for some of those lands. In the statute effectuating that exchange, Congress stated explicitly that the lands Alaska received in exchange would be treated, for all purposes, as section 6(i) land.

26. The Pebble Deposit is within the lands conveyed in that 1976 exchange.

27. The Pebble Deposit was discovered and recognized over the course of the late 1980s and the 1990s, by means of exploratory drilling in the area. The first rights owner was a company named Cominco that conducted the initial explorations. Cominco received mineral claims from the State of Alaska.

28. Northern Dynasty began investing in the Pebble Deposit in 2001, by purchasing the mineral rights from Cominco. Northern Dynasty then invested in further exploratory work to expand the Deposit, and filed additional mineral claims with the State of Alaska as it learned how large the Deposit truly is.

29. In 2004, Northern Dynasty commissioned multiple third-party studies of environmental conditions at and near the Pebble Deposit. This work came to involve over 100

6

independent scientists, investigating topics such as the hydrology of the area, the vegetation, the aquatic life in streams running down from the area of the Deposit, the economies and cultures of the closest communities, and more. The environmental work cost nearly $200 million.

30. By 2005, PLP had acquired mineral rights to 100% of the Pebble Deposit so far as it is currently known.

31. Meanwhile, PLP met repeatedly with federal and state agencies, including the EPA, the U.S. Fish and Wildlife Service, the Army Corps, and the Alaska Department of Natural Resources, in a set of working groups to assess what information would be useful for evaluating potential mining plans and making regulatory decisions about them. The working groups held multiple-day in-person meetings on a periodic basis from 2004 through 2008, and occasionally thereafter.

32. Unknown to PLP, the EPA started secretly meeting with certain nongovernmental groups that opposed the Pebble mine, and was developing plans to issue a veto of the Pebble mine under Clean Water Act section 404(c). The EPA official who led that secret project (Phil North) later testified that the EPA had colluded with the nongovernmental groups.

33. In July 2014, the EPA published a proposed determination to issue a veto under section 404(c). The EPA had no details about any actual Pebble mine but merely hypothesized various theoretical mines, as there had been no application by PLP for a CWA 404 permit at or by that time. The 2014 proposal took no account of any potential compensatory mitigation measures, even though such mitigation is commonplace for any Clean Water Act permit. Still, the 2014 proposal also suggested that a mine could be acceptable at a given scale smaller than the hypothetical mines the EPA contemplated.

34. PLP contested the 2014 proposal through actions in court, on grounds, *inter alia*, that it violated the Administrative Procedure Act, the Clean Water Act, and the Federal Advisory

Committees Act. The district court issued a preliminary injunction, barring the EPA from further action on the 2014 proposal pending the resolution of the litigation.

35. PLP and the EPA settled that previous litigation, and the case was dismissed. Among the EPA's commitments in the settlement agreement, it promised to initiate a process to withdraw the 2014 proposed determination.

36. PLP continued to work with the State of Alaska. PLP applied for and received from the pertinent Alaska agencies, such as the Department of Natural Resources, all permits or licenses necessary from Alaska at each stage of the development work.

37. In December 2017, PLP submitted to the Army Corps its application for the Clean Water Act permits needed for the actual mine that PLP planned to operate.

38. The project footprint for the actual mine that PLP submitted in its 2017 application to the Army Corps was smaller and more compact than prior conceptual plans, and certainly significantly smaller than what the EPA imagined in the 2014 proposal. The 2017 plan was comparable to what the 2014 EPA proposal had suggested would be acceptable.

39. While the Army Corps reviewed the application, PLP developed a compensatory mitigation plan.

40. Compensatory mitigation, to offset impacts from an authorized development by supporting, preserving, or enhancing environmental resources elsewhere nearby, is an integral and required part of environmental impact assessments. For decades, both the Army Corps and the EPA have acknowledged that compensatory mitigation must be applied with flexibility in Alaska because the State's unique characteristics can defeat ordinary mitigation efforts. A Memorandum of Agreement ("Alaska MOA") between the EPA and the Army Corps establishes guiding principles for compensatory mitigation specific to Alaska and calls for both agencies to apply the Clean Water Act 404(b) Guidelines flexibly to Alaska projects.

41. A particular obstacle to mitigation in Alaska is that, unlike in more densely populated States, Alaska has much less area of degraded environmental resources, particularly degraded wetlands, and thus less opportunity for a developer to achieve mitigation by restoring degraded areas. The Alaska MOA therefore allows mitigation measures such as preservation. The Army Corps and the EPA have regularly followed that approach in other projects.

42. PLP's proposed mitigation, as documented in a repeated series of mitigation plans submitted to the Army Corps, was extensive and consistent with the Alaska MOA.

43. In July 2020, the Army Corps published the final environmental impact statement ("EIS"), a mammoth analysis required under NEPA. The EIS is thousands of pages long. The EIS concluded that the Pebble mine, as proposed by PLP in its application, would have no "measurable impact on fish populations."

44. The EIS also noted the positive economic effects that a Pebble mine would have for southwestern Alaska.

45. The EPA maintains a memorandum of agreement ("404(q) MOA") with the Army Corps about how to coordinate reviews of Clean Water Act permit applications. The 404(q) MOA is mandated by section 404(q) of the Clean Water Act, 33 U.S.C. § 1344(q), which directed the Army Corps to enter into such MOAs with other agencies to "assure that, to the maximum degree practicable, a decision with respect to an application for a permit . . . will be made" within 90 days of the application, and "to minimize . . . delays in the issuance of permits." *Id.* Under the 404(q) MOA, if the EPA believes a project will have unacceptable adverse effects that could warrant a section 404(c) veto (supported by the facts and findings in the EIS), the EPA must notify the Army Corps by letter. This letter is called a "3(b) letter," named after the pertinent provision in the 404(q) MOA.

46. The EPA was fully aware of the application that PLP filed with the Army Corps, and it reviewed the application as it was pending. In fact, the EPA was a cooperating agency for the EIS

and participated in the NEPA process from the very beginning.  But the EPA decided not to send a 3(b) letter.  The EPA communicated with the Army Corps that it would not be issuing a 3(b) letter as they were satisfied with the work that had been done by the relevant agencies in the completion of the EIS.

47. At this point, and as reported in the national media, the Pebble mine appeared on a direct path to approval.

48. In August 2020, the eldest son of then-President Trump tweeted a public request that the President should order the EPA to block the Pebble mine.

49. Four days later, the Army Corps issued a press release stating that "the Corps finds that the project, as currently proposed, cannot be permitted under section 404 of the Clean Water Act."  This press release was issued before the regional office of the Army Corps made a decision, and before (if that decision were to be negative) PLP had any opportunity to file an appeal in the ordinary administrative process established by Army Corps regulations—much less for the Army Corps to carry out an impartial adjudication of such an appeal.

50. Nonetheless, with the guidance and direction of the Regional office of the Army Corps, PLP developed a distinctly different compensatory mitigation plan, focusing on preservation of a 122,445-acre area of the Koktuli River watershed.  PLP developed this plan in extensive consultation with the Army Corps.

51. During this consultation, the Army Corps conducted what is called the "fatal flaw review."  At this stage in the permitting process, the Army Corps would typically raise any concerns it might have about the sufficiency of the mitigation plan or any other deficiencies that might make permitting impossible.  This enables the applicant to revisit its plan and make appropriate adjustments prior to its final submission.  In the Pebble review, the Army Corps mentioned only two concerns, neither fatal.  One was an issue about a particular leasing instrument to be used for the Koktuli

preservation area, and the other was a request for additional details about monitoring, maintenance, and financial assurance.

52. The final compensatory mitigation plan, submitted on November 4, 2020, addressed both those concerns. On November 9, 2020, just five days later, the Army Corps decided to deny the permit application anyway. On November 25, 2020, it issued a Record of Decision deeming the mitigation plan insufficient. PLP had no opportunity to hear or address the issues presented in that Record of Decision before it was issued.

53. The process at the Army Corps was different from what it used for any other large-scale project in Alaska, for no apparent reason. The standard used in the Army Corps's decision was different from what it used for any other large-scale project. Indeed, the Army Corps applied an unprecedented, higher standard requiring that a project have no more than trivial environmental consequences.

54. PLP filed an appeal from the Record of Decision. The Army Corps headquarters office subsequently remanded the denial to the Alaska District for reconsideration on account of multiple deficiencies in the District's reasoning and processes. That reconsideration remains pending at this time, which is far longer than is ordinary for such a process.

55. Meanwhile, in May 2022, the EPA published a revised proposal for a section 404(c) veto. Despite the many issues with the 2014 proposed determination, the 2022 proposal largely relies upon it.

56. PLP and the State of Alaska filed extensive comments objecting to the proposed determination.

57. The EPA issued its Final Determination just nine months later. The Final Determination concluded that "discharges of dredged or fill material to construct and operate" the Pebble plan would have unacceptable adverse effects. 88 Fed. Reg. at 7,443. To prevent these asserted

11

"unacceptable adverse effects," the Final Determination prohibited the "specification of certain waters of the United States . . . as disposal sites for the discharge of dredged or fill material for the construction and routine operation" of the Pebble Project.

58. The Final Determination constituted two vetoes under section 404(c). First (the "Prohibition"), the EPA prohibited the issuance of a permit for the mine plan described in the 2020 update of PLP's permit application, as well as any permit for any mine that would "result in the same or greater levels of loss or streamflow changes." Second (the "Restriction"), the EPA restricted any discharge into the waters of the United States across a 200,000-acre area, stretching far beyond the actual planned mining operation, for any operation to mine the Pebble Deposit if such operation would "result in adverse effects similar or greater in nature and magnitude" to those the EPA described in its Final Determination.

59. The Final Determination focused on the effects of the 2020 mine plan (though PLP had already refined it before the EPA's 2022 proposal) on streams in the area. The EPA asserted that the mine would block or damage certain sections of stream that are spawning habitats for salmon living in Bristol Bay. The Final Determination made clear that a mining operation is prohibited not just based on the aggregate effect of a potential mine, but rather if the operation damages any single stretch of stream in the manner that the Final Determination describes.

60. The EPA's focus on the linear amount of stream purportedly being affected was contrary to the EIS that the Army Corps had prepared. The EIS, assessing the impact on actual fish, concluded that the Pebble mine would have no measurable impact on fish populations.

61. In October 2023, the State of Alaska sought permission from the Supreme Court to file a bill of complaint in that Court's original jurisdiction, to challenge the EPA vetoes. The United States opposed that request on grounds that Alaska could present its challenge in lower courts.

62. The Army Corps Alaska District, which is still engaged in reconsideration of its decision on PLP's permit application, issued a notice postponing any decision until the outcome of Alaska's request to the Supreme Court.

63. In January 2024, the Supreme Court denied leave for Alaska to present its challenge at that Court. The EPA's vetoes remain in force. The Army Corps has taken no further action on its remand reconsideration.

64. Streams occur across the Pebble Deposit area. It is not practicable to mine the Deposit without touching a single stream *at all*. The Final Determination blocked all mining of the Pebble Deposit. The EPA understood when it issued the Final Determination that would be the consequence.

65. The EPA's stated rationale for the Final Determination is that by blocking mining of the Pebble Deposit, the EPA is preserving salmon and salmon fisheries in Bristol Bay, to which the streams in the area eventually drain. The EIS said that salmon and salmon fisheries were not actually at risk. Yet at any rate, the EPA has destroyed PLP's property for the sake of preserving a different resource for public use.

## CLAIMS FOR RELIEF

### Count I – Permanent Categorical Taking

66. PLP repeats and realleges the foregoing allegations.

67. The Fifth Amendment of the United States Constitution prohibits the taking of private property for public use without just compensation. The property having been taken, the Fifth Amendment entitles the property holder to just compensation, and obligates the United States to pay that compensation.

13

68. The mineral rights that PLP holds to the Pebble Deposit are property for purposes of the Fifth Amendment. They are property under Alaska law, and they are alienable. Indeed, PLP obtained a portion of the mineral rights by purchasing them from their previous owner.

69. PLP invested over one billion dollars to acquire the property and pursue its development and use. PLP expected, throughout these investments, to be able to use the mineral rights to extract valuable minerals from the Pebble Deposit. Such extraction is the purpose of mineral rights, and is the only economic use of the mineral rights.

70. The Final Determination not only prohibited issuance of a permit for PLP's 2020 Mine Plan within the Pebble Deposit but also prohibited the issuance of a permit for any proposal to develop the Pebble Deposit that would result in any streamflow change, anywhere within a nearly 25-square-mile area, comparable to what the Final Determination described for the 2020 Mine Plan. Yet further, the Final Determination prohibited the discharge of material from any potential mine at Pebble Deposit, across a nearly 200,000-acre area, if the mining would result in adverse effects comparable to those described in the Final Determination. The areas covered by the Final Determination include the entirety of the Pebble Deposit so far as it is known, and the entirety of PLP's mineral rights.

71. The Final Determination made clear that a mining operation is prohibited not just based on the aggregate effect of a potential mine, but rather if the operation damages any single stretch of stream in the manner that the Final Determination describes.

72. PLP already made significant reductions in scale to reach the 2020 Mine Plan. Any reasonable or economically viable plan for mining the Pebble Deposit would have at least some similar streamflow impacts or adverse effects. The Final Determination blocks any economically viable use of PLP's mineral rights.

73. The taking was effectuated by the Final Determination, because the Final Determination bars the Army Corps, regardless of how it might assess the merits, from issuing a Clean Water Act permit on PLP's pending application or on any other for mining the Pebble Deposit.

74. The taking was completed by the issuance of the Final Determination. There is no further administrative remedy available to PLP.

75. Alternatively, the taking was effectuated by the Army Corps's refusal to issue a permit. By failing to complete its remand reconsideration, the Army Corps has acted in accordance with the EPA's vetoes, and the Army Corps does not assert any discretion to issue a permit in light of the EPA's vetoes.

76. Thus, the United States has permanently taken the mineral rights to which PLP is entitled. The United States took this property for public use, by determining that mining would be prohibited for the sake (assertedly) of preserving habitat for salmon.

77. The value of PLP's rights is vast: The Pebble Deposit has 34.3 million tonnes of recoverable copper, plus significant amounts of additional copper, gold, silver, molybdenum, and rhenium. The copper alone is the largest known undeveloped copper resource in the world and is equivalent to at least 4% of current world reserves of copper.

78. The United States has paid no compensation to PLP for its valuable mineral rights.

79. PLP seeks an award of just compensation under the Fifth Amendment to the Constitution for the value of the property that has been taken.

### Count II – Alternative *Ad Hoc* Permanent Taking

80. PLP repeats and realleges the foregoing allegations.

81. PLP had reasonable expectations of making economically beneficial use of its mineral rights, and any investor in its place would have had such expectations.

82. The land in question was conveyed to the State of Alaska specifically for mining, pursuant to congressional instructions.

83. The State of Alaska, which has primary regulatory authority over the area of the Pebble Deposit, has long designated the area for potential mineral development, and state agencies have consistently granted reasonable permits and licenses at each stage of the development process.

84. The mitigation measures that PLP proposed in its Clean Water Act permit application were enormous yet consistent with the principles established by the Army Corps and the EPA for mitigation measures in Alaska. In the Army Corps's review of the permit application, it raised to PLP no fatal flaws and instead told PLP its mitigation proposals were adequate. The EIS prepared by the Army Corps concluded PLP's proposed mine would have no measurable impact on fish populations and would have positive economic benefits for southwestern Alaska. The EPA then did not issue the 3(b) letter that was required under the 404(q) MOA for raising objections based on asserted adverse impacts.

85. Yet the EPA took the unprecedented step, in the Final Determination, of vetoing the issuance of a permit for PLP's 2020 Mine Plan and restricting any discharge into the waters of the United States across a nearly 200,000-acre area for any operation to mine the Pebble Deposit with any similar effects to those the EPA described in its Final Determination.

86. The EPA has only utilized its section 404(c) veto authority 13 other times in the history of the statute. None of the prior vetoes came close to the astounding geographical scale of the Final Determination, its sweeping scope, and its disregard for the facts and circumstances. The Final Determination affects orders of magnitude more area than any of the previous vetoes, and also takes the unprecedented step of barring even hypothetical, yet-unimagined mining projects miles away from where PLP has planned to build a mine. The expansive scope and unprecedented nature of the Final Determination could neither have been anticipated nor expected.

87. The Final Determination precludes economically beneficial uses of PLP's mineral rights. The stated purpose of the Final Determination was to block mining of the Pebble Deposit in order to preserve a resource, namely the salmon populations and fisheries in Bristol Bay, that the EPA said is valuable to the public.

88. Alternatively, the Army Corps's adherence to the Final Determination, by failing to complete its remand reconsideration and refusing PLP its permit, completes the taking.

89. Thus, the United States has permanently taken PLP's property, at least partially.

90. PLP seeks an award of just compensation under the Fifth Amendment to the Constitution for the value of the property taken.

## Count III – Temporary Taking

91. PLP repeats and realleges the foregoing allegations.

92. Even if the EPA were to withdraw its Final Determination, or if a court were to vacate the Final Determination, the Final Determination, so long as it is in force, blocks the Army Corps from issuing a Clean Water Act permit for the Pebble mine.

93. So long as the Final Determination remains in force, it constitutes at least a temporary taking of PLP's mineral rights, categorically or at least partially.

94. PLP seeks an award of just compensation under the Fifth Amendment to the Constitution for the value of its mineral rights that have been at least temporarily taken.

## **PRAYER FOR RELIEF**

**WHEREFORE**, PLP respectfully requests that the Court enter judgment in its favor to:

1. Award monetary relief to which PLP is entitled under 28 U.S.C. § 1491, in amounts to be determined;

2. To the extent available, award PLP pre-judgment and post-judgment interest;

3. To the extent available, award PLP costs and attorneys' fees; and

4. Award such other and further relief as this Court may deem necessary and proper.

Dated March 14, 2024

*/s/ Keith Bradley*
Keith Bradley, Attorney of Record
ScheLeese Goudy, Of Counsel
SQUIRE PATTON BOGGS (US) LLP
717 17th Street, Suite 1825
Denver, Colorado 80202
(303) 830-1776
(303) 894-9239 (facsimile)
keith.bradley@squirepb.com
scheleese.goudy@squirepb.com

Jeffrey M. Walker, Of Counsel
Katherine E. Wenner, Of Counsel
SQUIRE PATTON BOGGS (US) LLP
2000 Huntington Center
41 South High Street
Columbus, Ohio 43215
(614) 365-2700
(614) 365-2499 (facsimile)
jeffrey.walker@squirepb.com
katherine.wenner@squirepb.com

*Attorneys for Plaintiffs*